## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALAN CHU, derivatively on behalf of PELOTON INTERACTIVE, INC.,<br><br>    Plaintiff,<br><br>    vs.<br><br>JOHN FOLEY, JILL WOODWORTH, ERIK BLACHFORD, KAREN BOONE, JON CALLAGHAN, HOWARD DRAFT, JAY HOAG, WILLIAM LYNCH, and PAMELA THOMAS-GRAHAM,<br><br>    Defendants,<br><br>    and<br><br>PELOTON INTERACTIVE, INC.,<br><br>    Nominal Defendant. | Case No.:<br><br><br><br><br>**DEMAND FOR JURY TRIAL** |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

## <u>INTRODUCTION</u>

Plaintiff Alan Chu ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Peloton Interactive, Inc. ("Peloton" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants John Foley ("Foley"), Jill Woodworth ("Woodworth"), Erik Blachford ("Blachford"), Karen Boone ("Boone"), Jon Callaghan ("Callaghan"), Howard Draft ("Draft"), Jay Hoag ("Hoag"), William Lynch ("Lynch"), and Pamela Thomas-Graham ("Thomas-Graham") (collectively, the "Individual Defendants," and together with Peloton, the "Defendants") for breaches of their fiduciary duties as controlling shareholder, directors and/or officers of Peloton, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Securities Exchange

Act of 1934 (the "Exchange Act"), and for contribution Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Peloton, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Peloton's current controlling shareholder, directors and/or officers from September 11, 2020 until May 5, 2021 (the "Relevant Period").

2.      Peloton is a fitness company which holds itself out as operating "the largest interactive fitness platform in the world." Peloton primarily generates revenue through the sale of its "Connected Fitness Products" and accompanying subscriptions to the Company's live and on-demand online classes. The Company's Connected Fitness Products are, essentially, exercise equipment with built-in screens allowing consumers to stream live instructor-led classes, and include the Peloton Bike, a stationary bicycle, and the Peloton Tread, a treadmill.

3.      The Peloton Tread debuted in 2018. Since then, the Company has renamed the original model the "Tread+" after debuting a smaller treadmill now branded the "Tread."

4.      Throughout the Relevant Period, the Individual Defendants knew or recklessly disregarded that the Tread+ suffered from certain safety defects rendering it unsafe for use around

children and animals. Despite these defects, some Peloton marketing materials, actually depicted the Tread+ being used around children. At all times during the Relevant Period, the Individual Defendants failed to take adequate steps to render the Tread+ safe or to adequately warn consumers of the threat the Tread+ posed to children and animals. Moreover, even as reports of injuries and even a death involving the Tread+ were reported to the Company and were reported publicly, the Individual Defendants failed to timely recall the product or otherwise take additional measures to ensure consumer safety, and even after the product's safety defects were revealed to the public on April 17, 2021, the Individual Defendants still refused to address the issue until mounting public pressure forced them to relent on May 5, 2021 (the "Tread+ Misconduct").

5.     In addition, from September 11, 2020 until April 16, 2021 (the "Misleading Statement Relevant Period"), the Individual Defendants made and/or caused the Company to make a series of materially false and misleading statements and omissions concerning the safety of the Tread+ treadmill. They did this despite their knowledge of the dangers posed by the Tread+ and despite the fact that another Peloton Product, the Peloton Bike, was also experiencing safety issues resulting in a recall. Even as the recall occurred and the Individual Defendants made and caused the Company to make statements about the recall and about Peloton's product safety generally, they did not disclose any safety concerns about the Tread+ and in fact reaffirmed the Company's purported belief in and focus on product safety.

6.     These materially misleading statements and omissions were not corrected by the Individual Defendants or the Company during the Misleading Statement Relevant Period.

7.     The truth emerged on April 17, 2021, when the United States Consumer Product Safety Commission (the "CPSC"), issued a press release warning the American public that the Tread+ was so unsafe as to "require[] this notice to warn the public quickly of the hazard." The

press release also reported, *inter alia*, at least thirty-nine known incidents of children being injured while using the Tread+, including one incident resulting in the death of the child, and "urge[d] consumers with children at home to stop using the product immediately."

8.     Astonishingly, and despite this damning news, Defendant Foley wrote an email to Tread+ owners the very next day, April 18, 2021, informing them that despite the "CPSC believ[ing] that [Peloton] should stop selling or recall the Tread+[,]" Defendant Foley wanted "to assure [them] that [Peloton] ha[s] no intention of doing so." This email was also publicly posted on the Company's website.

9.     On this news the price of the Company's stock fell over 14%, or $16.28 per share, over the next three trading days, from $116.21 at close on April 16, 2021,[1] to $99.93 at close on April 21, 2021.

10.     It was not until May 5, 2021 that the Individual Defendants caused the Company to recall the Tread+, with Defendant Foley publicly acknowledging that the Company had "made a mistake" by not acting sooner.

11.     During the Misleading Statement Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) Peloton's Tread+ machine suffered from serious safety defects, which resulted in numerous injuries to children and pets; (2) contrary to the Company's public statements, safety was not

---

[1] The market was closed on Saturday, April 17, 2021, and Sunday, April 18, 2021, the days the truth emerged.

priority, given that the Individual Defendants were aware of the threat posed by the Tread+, but failed to remedy the threat or recall the Tread+; (3) in light of numerous reports of injuries, the CPSC was likely to, and ultimately did, declare the Tread+ a serious threat to public health and safety and to urge consumers to stop using it; (4) as disclosed by the CPSC, the Tread+ was also dangerous to adult users who lost their balance; (5) the Company failed to maintain adequate internal controls; and (6) as a result, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

12.    In further breach of their fiduciary duties, the Individual Defendants failed to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company.

13.    Moreover, during the Misleading Statement Relevant Period, seven of the Individual Defendants breached their fiduciary duties by engaging in insider sales while the Company's common stock was trading at artificially inflated prices due to the forgoing misrepresentations for collective proceeds in excess of $306 million.

14.    Also in breach of their fiduciary duties, the Individual Defendants engaged in and caused the Company to engage in the Tread+ Misconduct, by failing to remedy the threat posed by the Tread+ or to recall the Tread+ despite their knowledge of its threat to consumer safety.

15.    In yet further breach of their fiduciary duties, the Individual Defendants failed to maintain adequate internal controls.

16.    The Individual Defendants also violated section 14(a) of the Exchange Act by causing the Company to issue a proxy statement, filed with the SEC on Schedule 14A on October 22, 2020 (the "2020 Proxy Statement"), which contained false and misleading statements and

omissions of material fact.

17.     In light of the Individual Defendants' misconduct, which has subjected the Company to a consumer class action lawsuit pending in the United States District Court for the Northern District of California (the "Consumer Class Action"); the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Eastern District of New York (the "Securities Class Action"); the need to undertake internal investigations, the need to implement adequate internal controls; the losses from the waste of corporate assets, and the losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

18.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of the Company's board of directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and Section 21D of the

Exchange Act, 15 U.S.C. § 78u-4(f).

20.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action.

21.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

22.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

23.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

**PARTIES**

**Plaintiff**

24.     Plaintiff is a current shareholder of Peloton common stock. Plaintiff has continuously held Peloton common stock at all relevant times.

**Nominal Defendant Peloton**

25.     Peloton is a Delaware corporation with its principal executive offices at 125 West 25th Street, 11th Floor, New York, New York 10001. Peloton common stock trades on the NASDAQ under the ticker symbol "PTON."[2]

**Defendant Foley**

26.     Defendant Foley is one of Peloton's cofounders, has been CEO since June 2012 and has been Chairman of the Board since April 2015. According to the 2020 Proxy Statement, as

---

[2] The Company's common stock is divided into two classes: Class A and Class B. Class A common stock is entitled to one vote per share as compared to Class B being entitled to twenty votes per share. Class B common stock is convertible into Class A common stock at any time at the option of the shareholder, and automatically converts to Class A common stock upon most transfers.

of September 30, 2020, Defendant Foley beneficially owned 159,812 shares of the Company's Class A common stock and 18,236,232 shares of the Company's Class B common stock, together comprising 29.7% of total voting power, which together with his positions at the Company renders him a controlling shareholder. Given that the price per share of the Company's Class A stock at the close of trading on September 30, 2020 was $99.24, Defendant Foley owned approximately $1.8 billion worth of Peloton stock.

27.    For the fiscal year ended June 30, 2021, Defendant Foley is entitled to substantial compensation as the Company's CEO, including an annual base salary of $1,000,000.

28.    During the Misleading Statement Relevant Period, when the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Foley made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| November 9, 2020 | 100,000 | $101.79 | $10,179,000.00 |
| December 15, 2020 | 100,000 | $124.35 | $12,435,000.00 |
| January 15, 2021 | 100,000 | $161.86 | $16,186,000.00 |
| February 16, 2021 | 100,000 | $150.25 | $15,025,000.00 |
| March 15, 2021 | 100,000 | $110.45 | $11,045,000.00 |
| April 15, 2021 | 100,000 | $120.24 | $12,024,000.00 |

Thus, in total, before the fraud was exposed, he sold 600,000 shares on inside information for which he received approximately $76.9 million in proceeds. His insider sales, made with knowledge of material nonpublic information, before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

29.    The 2020 Proxy Statement stated the following about Defendant Foley:

John Foley is one of our co-founders and has served as our Chief Executive Officer since June 2012 and chairman of our board of directors since April 2015 when we converted from a limited liability company to a Delaware corporation. Before our founding, Mr. Foley served as the President of eCommerce at Barnes & Noble, Inc., a retailer of content, digital media, and educational products, from August 2010 to June 2012. From March 2005 to August 2010, Mr. Foley served as the co-founder

and Chief Executive Officer of Pronto.com, a price comparison service platform and a subsidiary of IAC/InterActiveCorp, a media and internet company.

**SKILLS AND EXPERIENCE**
Mr. Foley holds a B.S. in Industrial Engineering from the Georgia Institute of Technology and an M.B.A. from Harvard Business School. We believe Mr. Foley is qualified to serve on our board of directors because of the historical knowledge, operational expertise, leadership, and continuity that he brings to our board of directors as our co-founder and Chief Executive Officer.

**Defendant Woodworth**

30.     Defendant Woodworth has served as Peloton's CFO since April 2018. According to the Company's 2020 Proxy Statement, as of September 30, 2020, Defendant Woodworth beneficially owned 91,596 shares of the Company's Class A common stock and 3,200,000 shares of the Company's Class B stock, representing 6.1% of total voting power. Given that the price per share of the Company's Class A stock at the close of trading on September 30, 2020 was $99.24, Defendant Woodworth owned approximately $327 million worth of Peloton stock.

31.     For the fiscal year ended June 30, 2021, Defendant Woodworth is entitled to substantial compensation as the Company's CFO, including an annual base salary of $750,000.

32.     During the Misleading Statement Relevant Period, when the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Woodworth made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
| --- | --- | --- | --- |
| November 9, 2020 | 150,000 | $101.36 | $15,204,000.00 |
| February 16, 2021 | 50,000 | $150.26 | $7,513,000.00 |

Thus, in total, before the fraud was exposed, she sold 200,000 shares on inside information for which she received approximately $22.7 million in proceeds. Her insider sales, made with knowledge of material nonpublic information, before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

9

33. The 2020 Proxy Statement stated the following about Defendant Woodworth.

**JILL WOODWORTH** has served as our Chief Financial Officer since April 2018. From April 2006 to April 2018, Ms. Woodworth served as a Managing Director for J.P. Morgan, a multinational investment bank and financial services company. From July 1994 to April 2006, Ms. Woodworth worked in investment banking at Morgan Stanley & Co. LLC, a multinational investment bank and financial services company, where she held various positions within equity capital markets and client coverage. Ms. Woodworth holds a B.S. in Economics from the Massachusetts Institute of Technology.

### Defendant Blachford

34. Defendant Blachford has served as a Company director since April 2015. He also serves as Chair of the Compensation Committee and as a member of the Nominating, Governance, and Corporate Responsibility Committee. Moreover, he is the Lead Independent Director. According to the Company's 2020 Proxy Statement, on September 30, 2020, Defendant Blachford beneficially owned 475,739 shares of the Company's Class A common stock and 1,340,000 shares of the Company's Class B stock, representing 2.7% of total voting power. Given that the price per share of the Company's Class A stock at the close of trading on September 30, 2020 was $99.24, Defendant Blachford owned approximately $180 million worth of Peloton stock.

35. For the fiscal year ended June 30, 2021, Defendant Blachford is entitled to substantial compensation for his services as a director, including an annual stock option grant valued at $250,000.

36. The 2020 Proxy Statement stated the following about Defendant Blachford:

Erik Blachford has served as a member of our board of directors since April 2015. As an independent venture capital investor and advisor since January 2011, he focuses on consumer tech and travel companies and has invested in companies such as Zillow, Glassdoor, Grove Collaborative, and Hotel Tonight. He was a member of the founding team at Expedia, and served as the company's second Chief Executive Officer, then as the Chief Executive Officer of IAC/InterActiveCorp's travel division, IAC Travel, until 2005. He was the Chief Executive Officer at Terrapass, Inc. from April 2007 to September 2009, and the Chief Executive Officer at Butterfield & Robinson, Inc. from September 2009 to January 2011.

Mr. Blachford has also consulted as a Venture Partner at Technology Crossover Ventures, a private equity and venture capital firm, since March 2011. Mr. Blachford currently serves on the board of directors of Zillow Group, Inc. and several private companies.

**SKILLS AND EXPERIENCE**

He holds a B.A. in English and theater from Princeton University, an M.B.A. from Columbia Business School, and an M.F.A. in Creative Writing from San Francisco State University. We believe Mr. Blachford is qualified to serve on our board of directors based on his strategic and operational experience as a former executive officer and his extensive experience working with the management teams of, and investing in, a number of privately and publicly held companies.

**<u>Defendant Boone</u>**

37.     Defendant Boone has served as a Company director since January 2019. She also serves as Chair of the Audit Committee. According to the Company's 2020 Proxy Statement, on September 30, 2020, Defendant Boone beneficially owned 35,357 shares of the Company's Class A common stock and 600,000 shares of the Company's Class B stock, representing 1.2% of total voting power. Given that the price per share of the Company's Class A stock at the close of trading on September 30, 2020 was $99.24, Defendant Boone owned approximately $63.1 million worth of Peloton stock.

38.     For the fiscal year ending June 30, 2021, Defendant Boone is entitled to substantial compensation as a director including a stock option grant valued at $250,000.

39.     During the Misleading Statement Relevant Period, when the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Boone made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| February 8, 2021 | 35,357 | $144.39 | $5,105,197.23 |
| February 10, 2021 | 16,500 | $150.16 | $2,477,640.00 |
| February 12, 2021 | 83,500 | $151.47 | $12,647,745.00 |

Thus, in total, before the fraud was exposed, she sold 135,357 shares on inside information for

which she received approximately $20.2 million in proceeds. Her insider sales, made with knowledge of material nonpublic information, before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

40.     The 2020 Proxy Statement stated the following about Defendant Boone:

Karen Boone has served as a member of our board of directors since January 2019. Ms. Boone most recently served as the President, Chief Financial and Administrative Officer of Restoration Hardware, Inc., a home furnishings company, from May 2014 to August 2018 and as Chief Financial Officer from June 2012 to May 2014. Prior to that, from 1996 to 2012, Ms. Boone held various roles at Deloitte & Touche LLP, a public accounting firm, most recently as an Audit Partner. Ms. Boone currently serves on the board of directors of Sonos, Inc. and several private companies.

**SKILLS AND EXPERIENCE**
Ms. Boone holds a B.S. in Business Economics from the University of California, Davis. We believe Ms. Boone is qualified to serve on our board of directors because of her extensive experience leading a consumer brand and her expertise and background with regard to accounting and financial matters.

**Defendant Callaghan**

41.     Defendant Callaghan has served as a Company director since April 2015. He also serves as a member of both the Audit Committee and the Nominating, Governance, and Corporate Responsibility Committee. According to the 2020 Proxy Statement, as of September 30, 2020, Defendant Callaghan beneficially owned 774,407 shares of the Company's Class A common stock and 5,106,469 shares of the Company's Class B common stock, representing 10.4% of total voting power. Given that the price per share of the Company's Class A common stock at the close of trading on September 30, 2020 was $99.24, Defendant Callaghan owned approximately $583 million worth of Peloton stock.

42.     For the fiscal year ending June 30, 2021, Defendant Callaghan is entitled to substantial compensation as a director, including a stock option grant of $250,000.

43.     During the Misleading Statement Relevant Period, when the Company's stock price

was artificially inflated and before the scheme was exposed, Defendant Callaghan made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| November 11, 2020 | 15,000 | $103.77 | $1,556,550.00 |
| December 9, 2020 | 15,000 | $115.19 | $1,727,850.00 |
| January 13, 2021 | 15,000 | $163.19 | $2,447,850.00 |
| February 10, 2021 | 15,000 | $147.25 | $2,208,750.00 |
| March 10, 2021 | 15,000 | $115.12 | $1,726,800.00 |
| April 14, 2021 | 15,000 | $120.01 | $1,800,150.00 |

Thus, in total, before the fraud was exposed, he sold 90,000 shares on inside information for which he received approximately $11.5 million in proceeds. His insider sales, made with knowledge of material nonpublic information, before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

44.     The 2020 Proxy Statement stated the following about Defendant Callaghan:

Jon Callaghan has served as a member of our board of directors since April 2015. Mr. Callaghan is a founder and Managing Member of True Ventures, a venture capital firm, where he has served since January 2006. Prior to True Ventures, Mr. Callaghan served as a Managing Director at Globespan Capital, a venture capital firm, and as a Managing Partner at CMGI@Ventures, CMGI Inc.'s affiliated venture capital group. Mr. Callaghan served on the board of directors of Fitbit, Inc. from September 2008 to May 2018 and currently serves as a member of the board of directors of several private companies.

**SKILLS AND EXPERIENCE**
Mr. Callaghan holds a B.A. in Government from Dartmouth College and an M.B.A. from Harvard Business School. We believe Mr. Callaghan is qualified to serve on our board of directors because of his extensive experience working with the management teams of, and investing in, a number of privately and publicly held companies.

**Defendant Draft**

45.     Defendant Draft has served as a Company director since April 2015. In addition, he serves as a member of the Audit Committee. According to the Company's 2020 Proxy Statement, as of September 30, 2020, Defendant Draft beneficially owned 342,702 shares of the

Company's Class A common stock and 850,433 shares of the Company's Class B common stock, representing 1.7% of total voting power. Given that the price per share of the Company's Class A stock at the close of trading on September 30, 2020 was $99.24, Defendant Draft owned approximately $118 million worth of Peloton stock.

46.     For the fiscal year ending June 30, 2021, Defendant Draft is entitled to substantial compensation as a Company director, including a stock option grant of $250,000.

47.     During the Misleading Statement Relevant Period, when the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Draft made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| October 19, 2020 | 20,000 | $130.95 | $2,619,000.00 |
| November 17, 2020 | 20,000 | $101.48 | $2,029,600.00 |
| December 17, 2020 | 20,000 | $136.01 | $2,720,200.00 |
| January 19, 2021 | 20,000 | $149.03 | $2,980,600.00 |
| February 17, 2021 | 20,000 | $140.06 | $2,801,200.00 |
| March 17, 2021 | 20,000 | $106.29 | $2,125,800.00 |

Thus, in total, before the fraud was exposed, he sold 120,000 shares on inside information for which he received approximately $15.3 million in proceeds. His insider sales, made with knowledge of material nonpublic information, before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

48.     The Company's 2020 Proxy Statement stated the following about Defendant Draft:

Howard Draft has served as a member of our board of directors since April 2015. Mr. Draft retired as the Executive Chairman at DraftFCB, a global integrated marketing communications firm in 2015. He was Chairman and CEO of DraftWorldWide from 1988 until 2006, at which time FCB and Draft were merged. Mr. Draft served as their Chairman and CEO until 2009. Mr. Draft currently serves on the board of directors of Emisphere Technologies, Inc. and previously sat on the board of directors of optionsXpress Holdings, Inc. from April 2007 until its acquisition by Charles Schwab Corporation in September 2011.

**SKILLS AND EXPERIENCE**

Mr. Draft holds a B.A. in Philosophy and Art History from Ripon College. We believe Mr. Draft is qualified to serve on our board of directors because he brings entrepreneurial and executive management experience, particularly in the areas of direct marketing and integrated marketing offerings on a global basis.

**Defendant Hoag**

49.     Defendant Hoag has served as a Company director since August 2018. In addition, he serves as a member of the Compensation Committee. According to the 2020 Proxy Statement as of September 30, 2020, Defendant Hoag beneficially owned 18,116 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A stock at the close of trading on September 30, 2020 was $99.24, Defendant Hoag owned approximately $1.8 million worth of Peloton stock.

50.     For the fiscal year ending June 30, 2021, Defendant Hoag is entitled so substantial compensation as a director, including a stock option grant of $250,000.

51.     The Company's 2020 Proxy Statement stated the following about Defendant Hoag:

Jay Hoag has served as a member of our board of directors since August 2018. Mr. Hoag is a co-founder and General Partner of Technology Crossover Ventures where he has served since June 1995. Mr. Hoag currently serves on the board of directors of Electronic Arts Inc., Tripadvisor, Inc., Zillow Group, Inc., and Netflix Inc. and several private companies. Mr. Hoag also previously served on the board of directors of various public companies, including, TechTarget, Inc. until July 2016.

**SKILLS AND EXPERIENCE**
Mr. Hoag holds a B.A. from Northwestern University and an M.B.A. from the University of Michigan. We believe Mr. Hoag is qualified to serve on our board of directors because of his extensive experience working with the management teams of, and investing in, a number of privately and publicly held companies.

**Defendant Lynch**

52.     Defendant Lynch has served as the company's President since January 2017 and as a Company director since August 2019. According to the Company's 2020 Proxy Statement, on September 30, 2020, Defendant Lynch beneficially owned 151,805 shares of the Company's Class A stock and 6,512,140 shares of the Company's Class B common stock, representing 12.2% of

total voting power. Given that the price per share of the Company's Class A stock at the close of trading on September 30, 2020 was $99.24, Defendant Lynch owned approximately $661 million worth of Peloton stock.

53.     For the fiscal year ending June 30, 2010, Defendant Lynch is entitled to significant compensation as Company President, including his annual base salary of $1,000,000.

54.     During the Misleading Statement Relevant Period, when the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Lynch made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| October 14, 2020 | 183,500 | $131.84 | $24,192,640.00 |
| December 14, 2020 | 163,500 | $121.51 | $19,866,885.00 |
| February 8, 2021 | 500,000 | $146.32 | $73,160,000.00 |
| February 16, 2021 | 116,670 | $150.08 | $17,509,833.60 |

Thus, in total, before the fraud was exposed, he sold 963,670 shares on inside information for which he received approximately $135 million in proceeds. His insider sales, made with knowledge of material nonpublic information, before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

55.     The 2020 Proxy Statement stated the following about Defendant Lynch:

William Lynch has served as our President since January 2017 and as a member of our board of directors since August 2019. Prior to joining us, Mr. Lynch served as the Chief Executive Officer of Savant Systems, LLC, a luxury smart home technology company, from May 2014 to November 2016. From March 2010 to June 2013, Mr. Lynch served as the Chief Executive Officer of Barnes & Noble, and from February 2009 to March 2010, Mr. Lynch served as the President of Barnes & Noble.com, a business division of Barnes & Noble, where he oversaw the creation of the Nook product line and software. Mr. Lynch has also held senior management roles at HSN.com, IAC/InterActiveCorp, and Palm Computing. Mr. Lynch previously served on the board of directors of Barnes & Noble from October 2011 to July 2013.

**SKILLS AND EXPERIENCE**
Mr. Lynch holds a B.S. in Economics from the University of Texas at Austin and

an M.B.A. from Columbia Business School. We believe Mr. Lynch is qualified to serve on our board of directors because of the strategic and operational experience and leadership that he brings as our President and the former chief executive officer and executive leader of public and private companies.

**Defendant Thomas-Graham**

56.     Defendant Thomas-Graham has served as a Company director since March 2018. She also serves as Chair of the Nominating, Governance, and Corporate Responsibility Committee and as a member of the Compensation Committee. According to the Company's 2020 Proxy Statement, on September 30, 2020, Defendant Thomas-Graham beneficially owned 18,116 shares of the Company's Class A stock and 600,000 shares of the Company's Class B common stock, representing 1.2% of total voting power. Given that the price per share of the Company's Class A stock at the close of trading on September 30, 2020 was $99.24, Defendant Thomas-Graham owned over $61.3 million worth of Peloton stock.

57.     For the fiscal year ending June 30, 2021, Defendant Thomas-Graham is entitled to significant compensation as a Company director, including a stock option grant of $250,000.

58.     During the Misleading Statement Relevant Period, when the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Thomas-Graham made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| November 9, 2020 | 75,000 | $101.36 | $7,602,000.00 |
| February 16, 2021 | 116,670 | $150.19 | $17,522,667.30 |

Thus, in total, before the fraud was exposed, she sold 191,670 shares on inside information for which she received approximately $25.1 million in proceeds. Her insider sales, made with knowledge of material nonpublic information, before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

59.     The 2020 Proxy Statement stated the following about Defendant Thomas-Graham:

17

Pamela Thomas-Graham has served as a member of our board of directors since March 2018. Since August 2016, Ms. Thomas-Graham has served as the Founder and Chief Executive Officer of Dandelion Chandelier LLC, a private digital media enterprise focused on the world of luxury. From 2010 to August 2016, she served as a member of the Executive Board at Credit Suisse Group AG, a multinational investment bank and financial services company. While at the firm she held several titles, including Chair, New Markets for the global Private Bank; and Global Chief Marketing and Talent Officer.

From 2008 to 2010, she served as a Managing Director at Angelo, Gordon & Co., a privately held investment firm. From 2005 through 2007, Ms. Thomas-Graham was a Group President of Liz Claiborne Inc. (now Tapestry). She served as President and Chief Executive Officer of NBC Universal's CNBC television, and President and Chief Executive Officer of CNBC.com, beginning in 1999. She began her career at global consultancy McKinsey & Co. in 1989, becoming the firm's first black woman partner in 1995.

Ms. Thomas-Graham is the Lead Independent Director of The Clorox Company. She also serves as a board member of Bumble Trading Inc.; Urban Compass, Inc.; Norwegian Cruise Line Holdings Ltd.; and the Bermuda-based Bank of N.T. Butterfield & Son Limited.

**SKILLS AND EXPERIENCE**
Ms. Thomas-Graham holds a B.A. in Economics from Harvard University and a joint M.B.A. - J.D. from Harvard Business School and Harvard Law School. We believe Ms. Thomas-Graham is qualified to serve on our board of directors because she brings invaluable strategic, operational, and corporate governance experience as a chief executive officer and executive leader of public and private companies.

## <u>FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS</u>

60.     By reason of their positions as controlling shareholder, officers, directors, and/or fiduciaries of Peloton and because of their ability to control the business and corporate affairs of Peloton, the Individual Defendants owed Peloton and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Peloton in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Peloton and its shareholders so as to benefit all shareholders equally.

61.     Each controlling shareholder, director, and officer of the Company owes to Peloton and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

62.     The Individual Defendants, because of their positions of control and authority as controlling shareholder, directors, and/or officers of Peloton, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

63.     To discharge their duties, the controlling shareholder, officers, and directors of Peloton were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

64.     Each Individual Defendant, by virtue of his or her position as a controlling shareholder, director, and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as controlling shareholder, directors, and officers of Peloton, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also controlling shareholder, officers, and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Peloton's Board at all relevant times.

65.     As controlling shareholder, senior executive officers, and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

66.     To discharge their duties, the controlling shareholders, officers, and directors of Peloton were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the controlling shareholders, officers, and directors of Peloton were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New York, and the United States, and pursuant to Peloton's own Code of Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Peloton conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make

reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Peloton and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Peloton's operations would comply with all applicable laws and Peloton's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

67.    Each of the Individual Defendants further owed to Peloton and the shareholders the duty of loyalty requiring that each favor Peloton's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

68.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Peloton and were at all times acting within the course and scope of such agency.

69.     Because of their advisory, executive, managerial, directorial, and controlling shareholder positions with Peloton, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

70.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Peloton.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

71.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

72.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of their fiduciary duties, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a), and the claims alleged in the Securities Class Action; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

73.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance

of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Peloton was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

74.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

## PELOTON'S CODE OF CONDUCT AND CORPORATE GOVERNANCE

75.     Peloton's Code of Conduct opens by stating that "Peloton is committed to promoting the high standards of honest and ethical business conduct and compliance with laws, rules and regulations that are applicable to its business."

76.     The Code of Code of Conduct further avers that Peloton will "abide by the following principles:"

- Honesty and candor in our activities, including the observance of the letter and the spirit of the law;
- Act in Peloton's best interest by avoiding conflicts or the appearance of conflicts between personal interest and the interests of Peloton;

* * *

- Preserve our reputation and avoid activities that might reflect poorly on Peloton; and
- Integrity in dealing with Peloton's assets, whether they be monetary, physical, or—most importantly—our people.

77.     The Code of Conduct further states: "You must always obey the law while performing your work for Peloton."

78.     In addition, with respect to "Insider Trading" the Code of Conduct states that "[if] you have access to inside information, you are not permitted to use or share inside information for stock trading purposes or for any other purpose except to conduct Peloton business." Moreover, the Code of Conduct continues that Peloton personnel "must exercise the utmost care when in possession of material non-public information."

79.     The Code of Conduct further states the following with regard to the Company's disclosure controls and public statements made on behalf of the Company, including SEC filings:

> If you collect, provide or analyze information for or otherwise contribute in any way to the preparation or verification of these reports, you should adhere to all disclosure controls and procedures and generally assist Peloton in producing financial disclosures that contain all of the information about Peloton that is required by law and would be important to enable investors to understand our business and its attendant risks. In particular:
>
> - you may not take or authorize any action that would cause Peloton's financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;
>
> - you must cooperate fully with our finance department, as well as our independent auditors and legal counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that Peloton's books and records, as well as its reports filed with the SEC, are accurate and complete; and
>
> - you should never knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of Peloton's reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of such reports accurate in all material respects.
>
> In connection with preparing the financial and other disclosures that we make to the public, including by press release or filing a document with the SEC, directors must, in addition to complying with all applicable laws, rules and regulations, follow these guidelines:

- act honestly, ethically, and with integrity;

- comply with The Code;

- endeavor to ensure complete, fair, accurate, timely and understandable disclosure in our filings with the SEC;

- raise questions and concerns regarding our public disclosures when necessary and ensure that such questions and concerns are appropriately addressed;

- act in good faith in accordance with the director's business judgment, without misrepresenting material facts or allowing independent judgment to be subordinated by others; and

- comply with our disclosure controls and procedures and internal controls over financial reporting.

If you become aware that our public disclosures are not full, fair and accurate, or if you become aware of a transaction or development that you believe may require disclosure, you should report the matter immediately to your supervisor, if applicable, or the Compliance Officer.

80.     The Code of Conduct further defines certain "Special Obligations" of Peloton's "Senior Financial Personnel" which the Code of Conduct defines as "the Chief Executive Officer, Chief Financial Officer, Global Controller, and any other persons performing siminalr functions." Specifically, these personnel are required under the Code of Conduct to:

- act with honesty and integrity and use due care and diligence in performing his/her/their responsibilities to Peloton;

- avoid situations that represent actual or apparent conflicts of interest with his/her/their responsibilities to Peloton, and disclose promptly to the Nominating, Governance and Corporate Responsibility Committee of the Board (the "Governance Committee") any transaction or personal or professional relationship that reasonably could be expected to give rise to such an actual or apparent conflict. . . .

* * *

- provide constituents with information that is accurate, complete, objective, relevant, timely and understandable, including information for inclusion in our submissions to governmental agencies or in public statements;

- comply with applicable laws, rules and regulations of federal, state and local governments, and of any applicable public or private regulatory and listing authorities; and

- achieve responsible use and control over all assets and resources entrusted to each Senior Financial Employee.

81.     Finally, with regard to reporting violations, the Code of Conduct states unambiguously: "If you are aware of a suspected or actual violation of The Code by others, it is your responsibility to report it. Failure to report such events is a violation of The Code."

82.     The Company also maintains a document titled "Committee Charter II" which serves as the charter of the Audit Committee (the "Audit Committee Charter"). It lists certain "Responsibilities and Duties" of the Audit Committee, including:

> 1. Review and discuss with management, Peloton's quarterly and annual financial results, earnings guidance and earnings press releases prior to distribution to the public.

> 2. Review Peloton's quarterly and annual financial statements.

83.     With respect to "Internal Controls" the Audit Committee Charter provides that the Audit Committee must, in pertinent part:

> Review and discuss with the Independent Auditors and Peloton's management their periodic reviews of the adequacy and effectiveness of Peloton's accounting and financial reporting processes and systems of internal control, including any control deficiencies, significant deficiencies and material weaknesses in their design or operation, and any necessary audit processes or procedures adopted in light of any control deficiencies.

84.     Finally, with respect to "Risk Oversight and Compliance," the Audit Committee Charter provides that the Audit Committee must, in relevant part:

> Review with management Peloton's major financial risk and enterprise exposures and the steps management has taken to monitor or mitigate such exposures, including Peloton's procedures and any related policies with respect to risk assessment and risk management.

85.     In violation of the Code of Conduct and the Company's corporate governance, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to engage in the Tread+ Misconduct, to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of their fiduciary duties, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a), the claims alleged in the Securities Class Action, and aiding and abetting thereof.  Moreover, seven of the Individual Defendants violated the Code of Conduct by engaging in insider trading. Also in violation of the Code of Conduct and relevant corporate governance, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct and the law.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

86.     Peloton is a fitness company which holds itself out as operating "the largest interactive fitness platform in the world." Peloton primarily generates revenue through the sale of its "Connected Fitness Products" and accompanying subscriptions to the Company's live and on-demand online classes. The Company's Connected Fitness Products are, essentially, exercise equipment with built-in screens allowing consumers to stream live instructor-led classes, and include the Peloton Bike, a stationary bicycle, and the Peloton Tread, a treadmill

87.     In addition to its initial Peloton Bike product, the Company launched a treadmill—the Peloton Tread—in 2018. In September 2020, after debuting a smaller treadmill which took over the "Tread" name, the Company renamed the original Tread the "Tread+."

**The Tread+ Misconduct**

88.     Throughout the Relevant Period, the Individual Defendants knew or acted in reckless disregard for the truth that the Tread+ posed a significant danger to consumers, and especially to children and animals.

89.     The Tread+ sold at a retail price of $4,295. Marketing materials for the Tread+, indicated that it was appropriate to use both with and around children. For example, the picture below shows a woman and a child participating in a Peloton class through the Tread+'s built-in screen:



90.     However, as would later be revealed by the CPSC, the Tread+ was not safe for use around children in any circumstances. To wit, the CPSC would eventually warn consumer: "***Stop using the Peloton Tread+ if there are small children or pets at home.***" (Emphasis added.) The danger posed by the Tread+ was so great that the CPSC added: "If consumers must continue to use the product, CPSC urges consumers to ***use the product only in a locked room, to prevent access to children and pets while the treadmill is in use.***" (Emphasis added.)

91.     The CPSC emphasized that even the presence of an adult did not make it safe for children to be near the Tread+. As the CPSC further warned: "Incidents suggest that ***children may be seriously injured while the Tread+ is being used by an adult, not just when a child has unsupervised access to the machine.***" (Emphasis added.)

92.     The Tread+ was not safe to have around children, despite the Company's marketing to the contrary, because it suffered from certain design defects including. but not limited to, its being comparatively light for a treadmill; its unusually high clearance from the bottom of the tread to the floor; the absence of sensors to stop the machine if a child, animal, or anything else becomes trapped between the tread and the floor; and the absence of any other effective features to shut the machine down in the event a child or animal is pulled under the machine or to prevent such incidents from occurring in the first place.

93.     As described above, the Company primarily earns revenue from its core business which is selling Connected Fitness Products, like the Tread+, and accompanying subscriptions to its live and on-demand classes. These sales constitute the Company's core operations. As such, the success of the Tread+ was crucial to the Company's financial viability and prospects, and any safety defects which rendered the product unfit for sale or which required a recall would be known to at least the Company's officers and directors. Consequently, senior executives and directors are presumed to have knowledge and awareness of the facts and circumstances related to the Thread+'s safety defects.

94.     Moreover, the Individual Defendants had actual knowledge during the Relevant Period of the problems plaguing the Thread+. On March 18, 2021 Defendant Foley issued a warning to Tread+ owners revealing that a child had been killed by a Tread+ treadmill, but without revealing the full extent of the safety problem, as would later be revealed by the CPSC, and without

taking any further remedial measures to recall the unsafe machines or to otherwise to remedy the problem.

95.    Even after the truth was revealed to the public by the CPSC on April 17, 2021, at which point the Individual Defendants clearly had actual knowledge, the very next day, April 18, 2021, Defendant Foley stated that despite the danger the Tread+ posed, the Company would be taking no remedial action and had "no intention" of either recalling or ceasing sales of the product.

96.    It was only on May 5, 2021 that the Tread+ was finally recalled, after outcry over the Company's and Defendant Foley's seeming indifference to the danger posed by Tread+ machines. On that day, Defendant Foley acknowledged in a statement posted on the Company website that "*Peloton made a mistake in our initial response to the Consumer Product Safety Commission's request that we recall the Tread+. We should have engaged more productively with them from the outset.* For that, I apologize." (Emphasis added.)

### The False and Misleading Statements

*September 11, 2020 Annual Report*

97.    On September 11, 2020, Peloton filed its annual report for the fiscal year ended June 30, 2020, with the SEC on Form 10-K (the 2020 10-K). The 2020 10-K was signed by Defendants Foley, Woodworth, Blachford, Boone, Callghan, Draft, Hoag, Lynch, and Thomas-Graham and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Foley and Woodworth attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

98.     The 2020 10-K discussed in general terms the risk posed to the Company by design and manufacturing defects, without discussing with any specificity the risk which the known design defects of the Tread+ posed. The 2020 10-K stated, in relevant part:

**_Our products and services may be affected from time to time by design and manufacturing defects that could adversely affect our business and result in harm to our reputation._**

We offer complex hardware and software products and services that can be affected by design and manufacturing defects. Sophisticated operating system software and applications, such as those offered by us, often have issues that can unexpectedly interfere with the intended operation of hardware or software products. Defects may also exist in components and products that we source from third parties. Any such defects could make our products and services unsafe, create a risk of environmental or property damage and personal injury, and subject us to the hazards and uncertainties of product liability claims and related litigation. In addition, from time to time we may experience outages, service slowdowns, or errors that affect our fitness and wellness programming. As a result, our services may not perform as anticipated and may not meet customer expectations. There can be no assurance that we will be able to detect and fix all issues and defects in the hardware, software, and services we offer. Failure to do so could result in widespread technical and performance issues affecting our products and services and could lead to claims against us. We maintain general liability insurance; however, design and manufacturing defects, and claims related thereto, may subject us to judgments or settlements that result in damages materially in excess of the limits of our insurance coverage. In addition, we may be exposed to recalls, product replacements or modifications, write-offs of inventory, property and equipment, or intangible assets, and significant warranty and other expenses such as litigation costs and regulatory fines. If we cannot successfully defend any large claim, maintain our general liability insurance on acceptable terms, or maintain adequate coverage against potential claims, our financial results could be adversely impacted. Further, quality problems could adversely affect the experience for users of our products and services, and result in harm to our reputation, loss of competitive advantage, poor market acceptance, reduced demand for our products and services, delay in new product and service introductions, and lost revenue.

99.     The 2020 10-K also contained a general statement regarding "legal proceedings, regulatory disputes, and governmental inquiries" which posed a risk to the Company. Like the statement concerning design defects, this statement failed to address with specificity the known

problems affecting the Tread+ and the potential these problems had for creating a regulatory

dispute with the CPSC. The 2020 10-K stated, in relevant part:

> *From time to time, we may be subject to legal proceedings, regulatory disputes, and governmental inquiries that could cause us to incur significant expenses, divert our management's attention, and materially harm our business, financial condition, and operating results.*

> From time to time, we may be subject to claims, lawsuits, government investigations, and other proceedings involving products liability, competition and antitrust, intellectual property, privacy, consumer protection, securities, tax, labor and employment, commercial disputes, and other matters that could adversely affect our business operations and financial condition. As we have grown, we have seen a rise in the number and significance of these disputes and inquiries. Litigation and regulatory proceedings, and particularly the intellectual property infringement matters that we are currently facing or could face, may be protracted and expensive, and the results are difficult to predict. Certain of these matters include speculative claims for substantial or indeterminate amounts of damages and include claims for injunctive relief. Additionally, our litigation costs could be significant. Adverse outcomes with respect to litigation or any of these legal proceedings may result in significant settlement costs or judgments, penalties and fines, or require us to modify our products or services, make content unavailable, or require us to stop offering certain features, all of which could negatively affect our membership and revenue growth. . . .

> The results of litigation, investigations, claims, and regulatory proceedings cannot be predicted with certainty, and determining reserves for pending litigation and other legal and regulatory matters requires significant judgment. There can be no assurance that our expectations will prove correct, and even if these matters are resolved in our favor or without significant cash settlements, these matters, and the time and resources necessary to litigate or resolve them, could harm our business, financial condition, and operating results.

100.    The 2020 10-K also stated that the Company's internal controls were adequate,

despite the 2020 10-K's false and misleading statements and omissions of material fact. In relevant

part the 2020 10-K stated:

> *Evaluation of Disclosure Controls and Procedures*
> Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, *we conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures*, as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act as of June 30, 2020. *Based on this evaluation, our Chief Executive Officer and*

*Chief Financial Officer concluded that as of June 30, 2020, our disclosure controls and procedures were effective to provide reasonable assurance that information required to be disclosed in the reports we file and submit under the Exchange Act is recorded, processed, summarized, and reported as and when required, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding its required disclosure.*

*Remediation of Material Weakness*
In connection with our audit of the fiscal year 2018 consolidated financial statements, we and our independent registered public accounting firm determined that we had material weaknesses in our internal control over financial reporting. These material weaknesses primarily pertained to IT general controls, controls to address segregation of certain accounting duties, timely reconciliation and analysis of certain key accounts and the review of journal entries.

During the year ended June 30, 2020, *we implemented enhanced procedures to remediate the deficiencies in our internal control* over financial reporting that resulted in material weaknesses.

* * *

*We have completed execution of our remediation plan and successfully remediated the material weakness in internal control* over financial reporting described above as of June 30, 2020.

(Emphasis added.)

### October 15, 2020 Business Insider Article

101.    On October 15, 2020, the website *Business Insider* published an articled titled "Peloton issued a recall affecting nearly 30,000 bikes after reports of pedal breakages and customer injuries." As the title suggests, the article focused on a recall of clip-in bicycle pedals that the Company issued after receiving reports of 120 breakages and 16 injuries. The article contained a statement by a Peloton spokesperson emphasizing how Peloton considered safety a priority, a statement at odds with the Individual Defendants' and Peloton's actions in the Tread+ Misconduct. Specifically, the article contained the following:

The company announced Thursday that the recall applies to PR70P pedals, fitted on bikes sold between July 2013 and May 2016. The recall affects 27,000 bikes.

Peloton said it received 120 reports of pedal breakage and 16 reports of injury. Of the injuries, five required medical care, "such as stitches to the lower leg," the company said in a blog post.

"***There is no greater priority than the safety and well-being of Peloton Members***," Peloton spokeswoman Amelise Lane said in an email to Business Insider. The company has asked customers to stop using bikes with these pedals and get a replacement from the company.

Peloton customers previously said they have waited months to get replacement pedals after the accessories break off mid-ride, Business Insider's Madeline Stone reported. The company has limited some in-home service due to the COVID-19 pandemic, and customers also reported struggling to fix their own bikes.

(Emphasis added.)

### October 16, 2020 New York Times Article

102.    On October 16, 2020, the *New York Times* reported on the recall of bicycle pedals with an article titled, "Peloton Recalls Pedals on Thousands of Bikes After Reports of Injury." Like the *Business Insider* article, it contained statements from the same Company spokeswoman emphasizing Peloton's commitment to safety, a statement at odds with the Tread+ Misconduct. The *New York Times* article stated, in relevant part:

> ***Amelise Lane, a spokeswoman for Peloton, said the company was focused on the safety and well-being of customers. "We take pride in providing the best equipment, proprietary networked software, and world-class streaming digital fitness and wellness content that our members love***," she said in a statement. She added that the recall affected only customers using their out-of-warranty original pedals on the affected bikes sold. The recall was earlier reported by Business Insider.

(Emphasis added.)

### October 22, 2020 Proxy Statement

103.    On October 22, 2020, the Company filed the 2020 Proxy Statement with the SEC. Defendants Foley, Blachford, Boone, Callghan, Draft, Hoag, Lynch, and Thomas-Graham

solicited the 2020 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[3]

104.     The 2020 Proxy Statement also called for Company shareholders to, *inter alia*: (1) reelect Defendants Blachford, Draft, and Thomas-Graham as directors; (2) ratify the appointment of Ernst & Young LLP as the Company's independent auditor; and (3) approve, in an advisory vote, setting the frequency of future advisory votes on named executive compensation to once every three years.

105.     The 2020 Proxy Statement touted the certain "Governance and Board Highlights" meant to assure investors that the Company was being well overseen by the Individual Defendants. Among the listed "Highlights" was "[c]omprehensive risk oversight practices, including cybersecurity, data privacy, legal and regulatory matters, and other critical areas." However, contrary to this statement, the Company's risk oversight practices were inadequate, allowing the Individual Defendants and the Company to engage in the Tread+ Misconduct and issue false and misleading statements disguising it. Moreover, the Company eventually became subject to regulatory action from the CPSC which it failed to adequately disclose the risk of, contrary to the assertion that the Company had "[c]omprehensive risk oversight practices" over "legal and regulatory matters."

106.     Moreover, the 2020 Proxy Statement maintained that, *inter alia*, the Company's Audit Committee carried out their duties including "reviewing and discussing with management [Peloton's] quarterly and annual financial results, earnings guidance and earnings press releases

---

[3] Plaintiff's allegations with respect to the misleading statements in the 2020 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

prior to distribution to the public;" "considering the adequacy of [Peloton's] internal controls;" and "inquiring about significant risks, reviewing our policies for risk assessment and risk management, and assessing the steps management has taken to control these risks." However, the Audit Committee was not effectively exercising these duties, given the false and misleading statements contained in the 2020 10-K and subsequent quarterly reports (discussed below), the inadequacy of the Company's internal controls at preventing the inclusion of false and misleading statements in the Company's SEC filings and public statements, and the significant, undisclosed risks facing the Company as a result of the Tread+ Misconduct and the Individual Defendants' scheme to disguise it.

107.   Finally, the 2020 Proxy Statement stated the following regarding the full Board's role in risk oversight:

> ***Our board of directors, as a whole, has responsibility for overseeing our risk management process***, although the committees of our board of directors oversee and review risk areas that are particularly relevant to them. ***The risk oversight responsibility of our board of directors and its committees is supported by our management reporting processes. Our management reporting processes are designed to provide our board of directors and our personnel responsible for risk assessment with visibility into the identification, assessment, and management of critical risks and management's risk mitigation strategies. These areas of focus include*** competitive, economic, operational, financial (accounting, credit, investment, liquidity, compensation-related risk, and tax), ***legal and regulatory compliance***, cybersecurity, ***and reputational risks***. Our board of directors reviews strategic and operational risk in the context of discussions, question and answer sessions, and reports from the management team at each regular board meeting, receives reports on all significant committee activities at each regular board meeting, and evaluates the risks inherent in significant transactions. ***Our audit committee assists our board in fulfilling its oversight responsibilities with respect to risk management.***
>
> Each committee of our board of directors meets with key management personnel and representatives of outside advisors to oversee risks associated with their respective principal areas of focus, as described below. ***We believe this division of responsibilities is an effective approach for addressing the risks we face and that our board leadership structure supports this approach.***

(Emphasis added.)

108.    As discussed, the Company and the Board did not have an effective approach for addressing risk, as evidenced by the Individual Defendants' and the Company's engagement in the Tread+ Misconduct and the scheme to issue false and misleading statements disguising the same.

109.    The 2020 Proxy Statement failed to disclose, *inter alia*, that: (1) Peloton's Tread+ machine suffered from serious safety defects, which resulted in numerous injuries to children and pets; (2) contrary to the Company's public statements, safety was not priority, given that the Individual Defendants were aware of the threat posed by the Tread+, but failed to remedy the threat or recall the Tread+; (3) in light of numerous reports of injuries, the CPSC was likely to, and ultimately did, declare the Tread+ a serious threat to public health and safety and to urge consumers to stop using it; (4) as disclosed by the CPSC, the Tread+ was also dangerous to adult users who lost their balance; (5) the Company failed to maintain adequate internal controls; and (6) as a result, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times. As a result of the foregoing, the Company's 2020 Proxy Statement was materially false and misleading.

110.    As a result of the material misstatements and omissions contained in the 2020 Proxy Statement, Company shareholders, *inter alia*, reelected Defendants Blachford, Draft, and Thomas-Graham as directors, allowing them to continue breaching their fiduciary duties to Peloton.

### *November 6, 2020 Quarterly Report*

111.    On November 6, 2020, the Company filed its quarterly report for the fiscal quarter ended September 30, 2020 on Form 10-Q with the SEC (the "1Q21 10-Q"). It was signed by Defendants Foley and Woodworth and contained SOX certifications, also signed by Defendants Foley and Woodworth, attesting to the accuracy of the financial statements contained therein, the

disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

112.     The 1Q21 10-Q discussed in general terms the risk posed to the Company by design and manufacturing defects, without discussing with any specificity the risk which the known design defects of the Tread+ posed. The 1Q21 10-Q stated, on relevant part:

> ***Our products and services may be affected from time to time by design and manufacturing defects that could adversely affect our business and result in harm to our reputation.***
>
> We offer complex hardware and software products and services that can be affected by design and manufacturing defects. Sophisticated operating system software and applications, such as those offered by us, often have issues that can unexpectedly interfere with the intended operation of hardware or software products. Defects may also exist in components and products that we source from third parties. Any such defects could make our products and services unsafe, create a risk of environmental or property damage and personal injury, and subject us to the hazards and uncertainties of product liability claims and related litigation. In addition, from time to time we may experience outages, service slowdowns, or errors that affect our fitness and wellness programming. As a result, our services may not perform as anticipated and may not meet customer expectations. There can be no assurance that we will be able to detect and fix all issues and defects in the hardware, software, and services we offer. Failure to do so could result in widespread technical and performance issues affecting our products and services and could lead to claims against us. We maintain general liability insurance; however, design and manufacturing defects, and claims related thereto, may subject us to judgments or settlements that result in damages materially in excess of the limits of our insurance coverage. In addition, we may be exposed to recalls, product replacements or modifications, write-offs of inventory, property and equipment, or intangible assets, and significant warranty and other expenses such as litigation costs and regulatory fines. If we cannot successfully defend any large claim, maintain our general liability insurance on acceptable terms, or maintain adequate coverage against potential claims, our financial results could be adversely impacted. Further, quality problems could adversely affect the experience for users of our products and services, and result in harm to our reputation, loss of competitive advantage, poor market acceptance, reduced demand for our products and services, delay in new product and service introductions, and lost revenue.

113.     The 1Q21 10-Q also contained a general statement regarding "legal proceedings, regulatory disputes, and governmental inquiries" which posed a risk to the Company. Like the

statement concerning design defects, this statement failed to address with specificity the known problems affecting the Tread+ and the potential these problems had for creating a regulatory dispute with the CPSC. The 1Q21 10-Q stated, in relevant part:

> ***From time to time, we may be subject to legal proceedings, regulatory disputes, and governmental inquiries that could cause us to incur significant expenses, divert our management's attention, and materially harm our business, financial condition, and operating results.***
>
> From time to time, we may be subject to claims, lawsuits, government investigations, and other proceedings involving products liability, competition and antitrust, intellectual property, privacy, consumer protection, securities, tax, labor and employment, commercial disputes, and other matters that could adversely affect our business operations and financial condition. As we have grown, we have seen a rise in the number and significance of these disputes and inquiries. Litigation and regulatory proceedings, and particularly the intellectual property infringement matters that we are currently facing or could face, may be protracted and expensive, and the results are difficult to predict. Certain of these matters include speculative claims for substantial or indeterminate amounts of damages and include claims for injunctive relief. Additionally, our litigation costs could be significant. Adverse outcomes with respect to litigation or any of these legal proceedings may result in significant settlement costs or judgments, penalties and fines, or require us to modify our products or services, make content unavailable, or require us to stop offering certain features, all of which could negatively affect our membership and revenue growth. . . .
>
> The results of litigation, investigations, claims, and regulatory proceedings cannot be predicted with certainty, and determining reserves for pending litigation and other legal and regulatory matters requires significant judgment. There can be no assurance that our expectations will prove correct, and even if these matters are resolved in our favor or without significant cash settlements, these matters, and the time and resources necessary to litigate or resolve them, could harm our business, financial condition, and operating results.

114.    The 1Q21 10-Q also contained the following evaluation of management, vouching for the adequacy of the Company's internal controls, despite the 1Q21 10-Q's false and misleading statements and omissions:

> ***Evaluation of Disclosure Controls and Procedures***
> Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and

procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, or the Exchange Act, as of September 30, 2020. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of September 30, 2020, our disclosure controls and procedures were effective to provide reasonable assurance that information required to be disclosed in the reports we file and submit under the Exchange Act is recorded, processed, summarized, and reported as and when required, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding its required disclosure.

### Changes in Internal Control over Financial Reporting

There were no changes in our internal control over financial reporting identified in connection with the evaluation required by Rule 13a-15(d) and 15d-15(d) of the Exchange Act that occurred during the quarter ended September 30, 2020 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### February 5, 2021 Quarterly Report

115.     On February 5, 2021, the Company filed its quarterly report for the fiscal quarter ended December 31, 2020 on Form 10-Q with the SEC (the "2Q21 10-Q"). It was signed by Defendants Foley and Woodworth and contained SOX certifications, also signed by Defendants Foley and Woodworth, attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

116.     The 2Q21 10-Q discussed in general terms the risk posed to the Company by design and manufacturing defects, without discussing with any specificity the risk which the known design defects of the Tread+ posed. The 2Q21 10-Q stated in relevant part:

> ### Our products and services may be affected from time to time by design and manufacturing defects that could adversely affect our business and result in harm to our reputation.
>
> We offer complex hardware and software products and services that can be affected by design and manufacturing defects. Sophisticated operating system software and applications, such as those offered by us, often have issues that can unexpectedly interfere with the intended operation of hardware or software products. Defects may

also exist in components and products that we source from third parties. Any such defects could make our products and services unsafe, create a risk of environmental or property damage and personal injury, and subject us to the hazards and uncertainties of product liability claims and related litigation. In addition, from time to time we may experience outages, service slowdowns, or errors that affect our fitness and wellness programming. As a result, our services may not perform as anticipated and may not meet customer expectations. There can be no assurance that we will be able to detect and fix all issues and defects in the hardware, software, and services we offer. Failure to do so could result in widespread technical and performance issues affecting our products and services and could lead to claims against us. We maintain general liability insurance; however, design and manufacturing defects, and claims related thereto, may subject us to judgments or settlements that result in damages materially in excess of the limits of our insurance coverage. In addition, we may be exposed to recalls, product replacements or modifications, write-offs of inventory, property and equipment, or intangible assets, and significant warranty and other expenses such as litigation costs and regulatory fines. If we cannot successfully defend any large claim, maintain our general liability insurance on acceptable terms, or maintain adequate coverage against potential claims, our financial results could be adversely impacted. Further, quality problems could adversely affect the experience for users of our products and services, and result in harm to our reputation, loss of competitive advantage, poor market acceptance, reduced demand for our products and services, delay in new product and service introductions, and lost revenue.

117.   The 2Q21 10-Q also contained a general statement regarding "legal proceedings, regulatory disputes, and governmental inquiries" which posed a risk to the Company. Like the statement concerning design defects, this statement failed to address with specificity the known problems affecting the Tread+ and the potential these problems had for creating a regulatory dispute with the CPSC. The 2Q21 10-Q stated in relevant part:

*From time to time, we may be subject to legal proceedings, regulatory disputes, and governmental inquiries that could cause us to incur significant expenses, divert our management's attention, and materially harm our business, financial condition, and operating results.*

From time to time, we may be subject to claims, lawsuits, government investigations, and other proceedings involving products liability, competition and antitrust, intellectual property, privacy, consumer protection, securities, tax, labor and employment, commercial disputes, and other matters that could adversely affect our business operations and financial condition. As we have grown, we have seen a rise in the number and significance of these disputes and inquiries. Litigation and regulatory proceedings, and particularly the intellectual property infringement

matters that we are currently facing or could face, may be protracted and expensive, and the results are difficult to predict. Certain of these matters include speculative claims for substantial or indeterminate amounts of damages and include claims for injunctive relief. Additionally, our litigation costs could be significant. Adverse outcomes with respect to litigation or any of these legal proceedings may result in significant settlement costs or judgments, penalties and fines, or require us to modify our products or services, make content unavailable, or require us to stop offering certain features, all of which could negatively affect our membership and revenue growth. . . .

The results of litigation, investigations, claims, and regulatory proceedings cannot be predicted with certainty, and determining reserves for pending litigation and other legal and regulatory matters requires significant judgment. There can be no assurance that our expectations will prove correct, and even if these matters are resolved in our favor or without significant cash settlements, these matters, and the time and resources necessary to litigate or resolve them, could harm our business, financial condition, and operating results.

118.    The 2Q21 10-Q also contained the following evaluation of management, vouching for the adequacy of the Company's internal controls, despite the 1Q21 10-Q's false and misleading statements and omissions:

### *Evaluation of Disclosure Controls and Procedures*
Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, or the Exchange Act, as of December 31, 2020. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of December 31, 2020, our disclosure controls and procedures were effective to provide reasonable assurance that information required to be disclosed in the reports we file and submit under the Exchange Act is recorded, processed, summarized, and reported as and when required, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding its required disclosure.

### *Changes in Internal Control over Financial Reporting*
There were no changes in our internal control over financial reporting identified in connection with the evaluation required by Rule 13a-15(d) and 15d-15(d) of the Exchange Act that occurred during the quarter ended December 31, 2020 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

*March 18, 2021 Statement by CEO*

119.    On March 18, 2021, Defendant Foley sent an email to Tread+ owners, a copy of which was also posted on Peloton's website, disclosing that a Tread+ machine had killed a child. The email contained the following statement, in relevant part:

> ***We design and build all of our products with safety in mind***. But in order to help ensure that you and your family members stay safe with Peloton products in your home, we need your help. This is especially true during what I hope is the final stretch of the pandemic where everyone is still at home. To prevent accidents, please take care to review and follow all the safety warnings and instructions that we provide, and always:
>
> - Keep children and pets away from Peloton exercise equipment at all times. Before you begin a workout, double check to make sure that the space around your Peloton exercise equipment is clear.
> - When you finish a workout on your Tread+, remove the safety key and store it out of reach of children and anyone else who should not be able to start the Tread+.

(Emphasis added.)

120.    The statements identified in ¶¶ 97–102, 111–119 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendant failed to disclose, *inter alia*, that: (1) Peloton's Tread+ machine suffered from serious safety defects, which resulted in numerous injuries to children and pets; (2) contrary to the Company's public statements, safety was not priority, given that the Individual Defendants were aware of the threat posed by the Tread+, but failed to remedy the threat or recall the Tread+; (3) in light of numerous reports of injuries, the CPSC was likely to, and ultimately did, declare the Tread+ a serious threat to public health and safety and to urge consumers to stop using it; (4) as disclosed by the CPSC, the Tread+ was also dangerous to adult users who lost their balance; (5) the Company failed to maintain adequate internal controls; and (6) as a result, Defendants' statements about the Company's business,

operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Emerges**

121.   On April 17, 2021, the CPSC issued a press release titled "CPSC Warns Consumers: Stop Using the Peloton Tread+." This press release warned the public against using the Tread+ and revealed the extent of the safety problem, stating in relevant part:

> *Urgent Warning Comes After Agency Finds One Death and Dozens of Incidents of Children Being Sucked Beneath the Tread+ (Formerly Known as the Tread)*
>
> WASHINGTON, D.C. – The U.S. Consumer Product Safety Commission (CPSC) is warning consumers about the danger of popular Peloton Tread+ exercise machine after ***multiple incidents of small children and a pet being injured beneath the machines. The Commission has found that the public health and safety requires this notice to warn the public quickly of the hazard.***
>
> The urgent warning comes less than a month after Peloton itself released news of a child's death by a Peloton Tread+ and CPSC's announcement of an investigation into that incident.
>
> The agency is continuing to investigate all known incidents of injury or death related to the Peloton Tread+.
>
> ***To date, CPSC is aware of 39 incidents including one death. CPSC staff believes the Peloton Tread+ poses serious risks to children for abrasions, fractures, and death. In light of multiple reports of children becoming entrapped, pinned, and pulled under the rear roller of the product, CPSC urges consumers with children at home to stop using the product immediately.*** This video demonstrates the hazard to children posed by the Tread+. [*Warning, video content may be disturbing to some viewers.*] ***It is believed that at least one incident occurred while a parent was running on the treadmill, suggesting that the hazard cannot be avoided simply by locking the device when not in use. Reports of a pet and objects being sucked beneath the Tread+ also suggest possible harm to the user if the user loses balance as a result.***
>
> **What should consumers do now?**
>
> - ***Stop using the Peloton Tread+ if there are small children or pets at home. Incidents suggest that children may be seriously injured while the Tread+ is being used by an adult, not just when a child has unsupervised access to the machine.***

44

- If consumers must continue to use the product, CPSC urges consumers to use the product only in a locked room, to prevent access to children and pets while the treadmill is in use. Keep all objects, including exercise balls and other equipment, away from the treadmill.
- ***When not in use, unplug the Tread+ and store the safety key away from the device and out of reach of children.***
- Report any Peloton Tread+ incidents to CPSC at www.SaferProducts.gov or to CPSC's Hotline at 800-638-2772.

Tread+ treadmills are sold directly to consumers via retail showrooms, and online at www.onepeloton.com.

Model No. TR-01 was called "Tread" from August 2018 to September 2020, when it was renamed "Tread+".

(Emphasis added.)

122.    Defendant Foley followed up this announcement the next day, April 18, 2021, by writing an email to Tread+ owners, the contents of which was also publicly posed on Peloton's website, insisting that despite the informing them that despite the "CPSC believ[ing] that [Peloton] should stop selling or recall the Tread+ . . . [Peloton] ha[s] no intention of doing so."

123.    On this news the price of the Company's stock fell over 14%, or $16.28 per share, over the next three trading days, from $116.21 at close on April 16, 2021, to $99.93 at close on April 21, 2021.

## **DAMAGES TO PELOTON**

124.    As a direct and proximate result of the Individual Defendants' conduct, Peloton will lose and expend many millions of dollars.

125.    Such expenditures include, but are not limited to, legal fees associated with the Consumer Class Action filed against the Company, legal fees associated with the Securities Class Action filed against the Company, its CEO, and its CFO, and any internal investigations and amounts paid to outside lawyers, accountants, and investigators in connection to those two actions.

Such expenditures also include, but are not limited to, legal fees arising from any other actions brought as a result of the Tread+ Misconduct.

126.    Moreover, such expenditures include but are not limited to the cost incurred by producing the defective Tread+ machines which are being returned or which cannot be sold, the cost of recalling them and refunding consumers, and other costs associated with remedying the Tread+ Misconduct.

127.    Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

128.    As a direct and proximate result of the Individual Defendants' conduct, Peloton has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

129.    Plaintiff brings this action derivatively and for the benefit of Peloton to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholders, directors, and/or officers of Peloton, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Sections 14(a) of the Exchange Act, and the claims alleged in the Securities Class Action, as well as the aiding and abetting thereof.

130.    Peloton is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

131.   Plaintiff is, and has been at all relevant times, a shareholder of Peloton. Plaintiff will adequately and fairly represent the interests of Peloton in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

132.   Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

133.   A pre-suit demand on the Board of Peloton is futile and, therefore, excused. At the time of filing of this complaint, the Board consists of the following eight individuals: Defendants Foley, Lynch, Blachford, Boone, Callaghan, Draft, Hoag, and Thomas-Graham (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to four of eight Directors that were on the Board at the time of the filing of this complaint.

134.   Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to engage in the Tread+ Misconduct and to make false and misleading statements and omissions of material fact while six of them engaged in insider sales based on material non-public information, all of which renders the Directors unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

135.   In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. While investors were duped into believing the

fraud perpetrated by the Individual Defendants, six of the Directors sold Company stock at artificially inflated prices based on inside information. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

136.    Additional reasons that demand on Defendant Foley is futile follow. Defendant Foley has served as the Company's CEO since June 2012 and as a Chairman of the Board since April 2015. He is one of the company's cofounders and is a controlling shareholder. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Foley with his principal occupation for which he receives handsome compensation as detailed above. His insider sales, which yielded approximately $76.9 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. As CEO, Defendant Foley was ultimately responsible for the Tread+ Misconduct and the many false and misleading statements and omissions that were made, including those contained in the 2020 10-K, the 1Q21 10-Q, and the 2Q21 10-Q, each of which he personally signed and signed SOX certifications for, and the 2020 Proxy Statement, which was solicited on his behalf. In addition, he personally made the false and misleading statements in his March 18, 2021 email to Tread+ owners. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in the Tread+ Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Foley is a defendant in the Securities Class Action. In addition, Defendant Foley's wife, Jill Foley, is employed by the Company as Vice President of Apparel. For these reasons, Defendant Foley

breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

137.     Additional reasons that demand on Defendant Lynch is futile follow. Defendant Lynch has served as the Company's President since January 2017 and as a Company director since August 2019. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Lynch with his principal occupation for which he receives handsome compensation as detailed above. His insider sales, which yielded approximately $135 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. As President, Defendant Lynch bears significant responsibility for the Tread+ Misconduct and the many false and misleading statements and omissions that were made, including those contained in the 2020 10-K, which he personally signed, and the 2020 Proxy Statement, which was solicited on his behalf. As a trusted Company director, Defendant Lynch conducted little, if any, oversight of the scheme to cause the Company to engage in the Tread+ Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Lynch breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

138.     Additional reasons that demand on Defendant Blachford is futile follow. Defendant Blachford has served as a Company director since April 2015. He also serves as Chair of the Compensation Committee, as a member of the Nominating, Governance, and Corporate Responsibility Committee, and as Lead Independent Director. Defendant Blachford has received and continues to receive substantial compensation for his role as a director as described above. As

a trusted Company director, Defendant Blachford conducted little, if any, oversight of the scheme to cause the Company to engage in the Tread+ Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Blachford signed, and thus personally made the false and misleading statements in the 2020 10-K; the 2020 Proxy Statement, which also contained false and misleading statements, was solicited on his behalf, and led to his reelection. For these reasons, Defendant Blachford breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

139.    Additional reasons that demand on Defendant Boone is futile follow. Defendant Boone has served as a Company director since January 2019. She also serves as the Chair of the Audit Committee. Defendant Boone has received and continues to receive significant compensation for her role as a director as described above. Her insider sales, which yielded approximately $20.2 million in proceeds, demonstrate her motive in facilitating and participating in the fraud. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to engage in the Tread+ Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Boone signed, and thus personally made the false and misleading statements in the 2020 10-K; the 2020 Proxy Statement, which also contained false and misleading statements, was solicited on her behalf. For these reasons, Defendant Boone breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

140.     Additional reasons that demand on Defendant Callaghan is futile follow. Defendant Callaghan has served as a Company director since April 2015. He also serves as a member of both the Audit Committee and the Nominating, Governance, and Corporate Responsibility Committee. Defendant Callaghan has received and continues to receive substantial compensation for his role as a director as described above. His insider sales, which yielded approximately $11.5 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in the Tread+ Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Callaghan signed, and thus personally made the false and misleading statements in the 2020 10-K; the 2020 Proxy Statement, which contained false and misleading statements, was solicited on his behalf. For these reasons, Defendant Callaghan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

141.     Additional reasons that demand on Defendant Draft is futile follow. Defendant Draft has served as Company director since April 2015. He also serves as a member of the Audit Committee. Defendant Draft has received and continues to receive substantial compensation for his role as a director as described above. His insider sales, which yielded approximately $15.3 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in the Tread+ Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the

scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Draft signed, and thus personally made the false and misleading statements in the 2020 10-K; the 2020 Proxy Statement, which also contained false and misleading statements, was solicited on his behalf, and led to his reelection. For these reasons, Defendant Draft breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

142.    Additional reasons that demand on Defendant Hoag is futile follow. Defendant Hoag has served as a Company director since August 2018. He also serves as a member of the Compensation Committee. Defendant Hoag has received and continues to receive substantial compensation for his role as a director as described above. As a trusted Company director, Defendant Hoag conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Hoag signed, and thus personally made the false and misleading statements in the 2020 10-K; the 2020 Proxy Statement, which also contained false and misleading statements, was solicited on his behalf. For these reasons, Defendant Hoag breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

143.    Additional reasons that demand on Defendant Thomas-Graham is futile follow. Defendant Thomas-Graham has served as a Company director since March 2018. She also serves as Chair of the Nominating, Governance, and Corporate Responsibility Committee and as a member of the Compensation Committee. Defendant Thomas-Graham has received and continues to receive significant compensation for her role as a director as described above. Her insider sales,

which yielded approximately $25.1 million in proceeds, demonstrate her motive in facilitating and participating in the fraud. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to engage in the Tread+ Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Thomas-Graham signed, and thus personally made the false and misleading statements in the 2020 10-K; the 2020 Proxy Statement, which also contained false and misleading statements, was solicited on her behalf, and led to her reelection. For these reasons, Defendant Thomas-Graham breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

144.    Additional reasons that demand on the Board is futile follow.

145.    As described above, six of the Directors directly engaged in insider trading, in violation of federal law and the Company's Code of Conduct. Together, Defendants Foley, Lynch, Boone, Callaghan, Draft, and Thomas-Graham received collective proceeds of approximately $284 million, with each of them individually receiving proceeds in excess (sometimes well in excess) of $10 million, as a result of insider transactions executed during the Relevant Period, when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. These sales were extremely lucrative, with each of the. Therefore, demand in this case is futile as to them, and excused.

146.    Demand in this case is further excused because the Directors are beholden to and controlled by Defendant Foley, who is CEO, Chairman, and a controlling shareholder with 29.7% of total voting power as of September 30, 2020. Defendant Foley and the other largest shareholder

identified in the 2020 Proxy Statement, the "TCV Funds," together own about 62% of total voting power. In light of this of these shareholdings, the Directors cannot impartially consider a demand against Defendant Foley, an interested, primary wrongdoer, as they are dependent on him for their continued employment with the Company and the lucrative compensation that goes with that; this is particularly true of Defendant Lynch who is also an executive at Peloton. Thus, the Directors are unable to evaluate a demand with disinterest or independence as a result of Defendant Foley's control over them.

147.    As the Directors have extensive, longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For instance, Defendants Blachford and Hoag serve together on the Board of Zillow Group, Inc. In addition, Defendants Foley and Lynch worked together at Barnes & Noble, from August 2010 to June 2012, during which time Defendant Lynch was CEO and Defendant Foley was President of eCommerce. Moreover, Defendants Foley, Lynch, and Blachford had overlapping tenures at IAC/InterActiveCorp and its subsidiaries. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Directors would be futile.

148.    Defendants Boone, Callaghan, and Draft (the "Audit Committee Defendants") serve as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the integrity of the Company's accounting and financial reporting process, the Company's financial statements, the performance of the Company's internal audit function, and the Company's compliance with applicable legal and regulatory requirements. The Audit Committee Defendants failed to fulfill

these obligations, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC and to fail to maintain internal controls. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

149.     In violation of the Code of Conduct and the Company's own corporate governance, the Directors conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to engage in the Tread+ Misconduct, to issue materially false and misleading statements to the public and to facilitate, and to disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Sections 14(a) of the Exchange Act, and the claims alleged in the Securities Class Action. In violation of the Code of Conduct, the Directors failed to comply with laws and regulations, maintain the accuracy of company records, public reports and communications, and uphold the responsibilities related thereto. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

150.     Peloton has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Peloton any part of the damages Peloton suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

151.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision

exists). As all of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

152.    The acts complained of herein constitute violations of fiduciary duties owed by Peloton's controlling shareholder, officers, and directors, and these acts are incapable of ratification.

153.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Peloton.  If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Peloton, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

154.    If there is no directors' and officers' liability insurance, then the Directors will not cause Peloton to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

155.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Directors for Violations of Section 14(a) of the Exchange Act

156.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

157.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

158.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

159.    Under the direction and watch of the Directors, the 2020 Proxy Statement failed to disclose, *inter alia*: (1) Peloton's Tread+ machine suffered from serious safety defects, which resulted in numerous injuries to children and pets; (2) contrary to the Company's public statements, safety was not priority, given that the Individual Defendants were aware of the threat posed by the

Tread+, but failed to remedy the threat or recall the Tread+; (3) in light of numerous reports of injuries, the CPSC was likely to, and ultimately did, declare the Tread+ a serious threat to public health and safety and to urge consumers to stop using it; (4) as disclosed by the CPSC, the Tread+ was also dangerous to adult users who lost their balance; (5) the Company failed to maintain adequate internal controls; and (6) as a result, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times. As a result, the 2020 Proxy Statement was materially false and misleading.

160.     The Directors also caused the 2020 Proxy Statement to be false and misleading with regard to the Board's risk oversight, which was inadequate in light of the Tread+ Misconduct and the scheme to make and/or cause the Company to make false and misleading and misleading statements of material fact.

161.     In the exercise of reasonable care, the Directors should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2020 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2020 Proxy Statement, including but not limited to, election of directors, ratification of an independent auditor, and an advisory vote on the frequency of future advisory votes on executive compensation.

162.     The false and misleading elements of the 2020 Proxy Statement led to, among other things, the election of the Defendants Blachford, Draft, and Thomas-Graham, which allowed them to continue to breach their fiduciary duties to Peloton.

163.     The Company was damaged as a result of the Directors' material misrepresentations and omissions in the 2020 Proxy Statement.

164.     Plaintiff, on behalf of Peloton, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

165.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

166.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Peloton's business and affairs.

167.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

168.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Peloton.

169.     In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

170.     In further breach of their fiduciary duties, the Individual Defendants either engaged in, or allowed the Company to engage in the Tread+ Misconduct.

171.     Also in breach of their fiduciary duties owed to Peloton, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact to the investing public that failed to disclose, *inter alia*: (1) Peloton's Tread+ machine suffered from serious safety defects, which resulted in

numerous injuries to children and pets; (2) contrary to the Company's public statements, safety was not priority, given that the Individual Defendants were aware of the threat posed by the Tread+, but failed to remedy the threat or recall the Tread+; (3) in light of numerous reports of injuries, the CPSC was likely to, and ultimately did, declare the Tread+ a serious threat to public health and safety and to urge consumers to stop using it; (4) as disclosed by the CPSC, the Tread+ was also dangerous to adult users who lost their balance; (5) the Company failed to maintain adequate internal controls; and (6) as a result, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

172.   The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

173.   In further breach of their fiduciary duties, seven of the Individual Defendants breached their fiduciary duties by engaging in insider sales while the Company's common stock was trading at artificially inflated prices due to the forgoing misrepresentations for collective proceeds in excess of $306 million.

174.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed

60

knowingly or recklessly and for the purpose and effect of artificially inflating the price of Peloton's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

175.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

176.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Peloton has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

177.    Plaintiff on behalf of Peloton has no adequate remedy at law.

### THIRD CLAIM

**Against Individual Defendants for Unjust Enrichment**

178.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

179.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Peloton.

180.    The Individual Defendants either benefitted financially from the improper conduct or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Peloton that was tied to the performance or artificially inflated valuation of Peloton, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

181.    Plaintiff, as a shareholder and a representative of Peloton, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other

compensation, including from any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

182.    Plaintiff on behalf of Peloton has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control

183.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

184.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Peloton, for which they are legally responsible.

185.    As a direct and proximate result of the Individual Defendants' abuse of control, Peloton has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Peloton has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

186.    Plaintiff on behalf of Peloton has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

187.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

188.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Peloton in a manner consistent with the operations of a publicly-held corporation.

189.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Peloton has sustained and will continue to sustain significant damages.

190.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

191.    Plaintiff, on behalf of Peloton, has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

192.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

193.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Peloton to waste valuable corporate assets and to incur many millions of dollars of legal liability and/or costs to defend unlawful actions.

194.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

195.    Plaintiff, on behalf of Peloton, has no adequate remedy at law.

## SEVENTH CLAIM

### Against Defendants Foley and Woodworth for Contribution Under Sections 10(b) and 21D of the Exchange Act

196.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

197.    Peloton, along with Defendants Foley and Woodworth are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of

Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Foley and Woodworth's willful and/or reckless violations of their obligations as controlling shareholder, officers, and/or director of Peloton.

198.     Defendants Foley and Woodworth, because of their positions of control and authority as controlling shareholder, officers, and/or director of Peloton, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Peloton, including the wrongful acts complained of herein and in the Securities Class Action.

199.     Accordingly, Defendants Foley and Woodworth are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

200.     As such, Peloton is entitled to receive all appropriate contribution or indemnification from Defendants Foley and Woodworth.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Peloton, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Peloton;

(c)     Determining and awarding to Peloton the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally,

together with pre-judgment and post-judgment interest thereon;

        (d)     Directing Peloton and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Peloton and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

        1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

        2. a provision to permit the shareholders of Peloton to nominate at least four candidates for election to the board; and

        3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

        (e)     Awarding Peloton restitution from the Individual Defendants, and each of them;

        (f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

        (g)     Granting such other and further relief as the Court may deem just and

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: May 20, 2021                Respectfully submitted,

                               **THE BROWN LAW FIRM, P.C.**

<u>*s/ Timothy Brown*</u>
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Attorneys for Plaintiff*

## **VERIFICATION**

I, Alan Chu am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _____, 2021.

_5/20/2021_

DocuSigned by:

4D3CDEA2C3E143E...

_____

Alan Chu